J-S19035-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| LISA C. PIERCE | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KEVIN PIERCE | : | |
| | : | |
| Appellant | : | No. 106 EDA 2022 |

Appeal from the Order Entered December 3, 2021
In the Court of Common Pleas of Chester County Civil Division at No(s):
2006-08798-DI

BEFORE:   PANELLA, P.J., OLSON, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.:              **FILED JULY 26, 2022**

Appellant, Kevin Pierce ("Husband"), appeals from the Order entered on December 3, 2021, awarding Appellee, Lisa C. Pierce ("Wife"), the tentative sum of $90,954.85 from Husband's Pennsylvania State Employee Retirement System ("SERS") pension account, to be paid at the rate of $1,000.00 per month.  After careful consideration, we affirm.

Our examination of the record below, with particular attention to the parties' 2008 Property Settlement Agreement ("PSA") and their 2009 Amended Property Settlement Agreement ("APSA") confirms that the trial court opinion and order of December 3, 2021, appropriately summarizes the pertinent facts and sets forth the provisions of each agreement, as follows:

> This matter [came] before [the trial court] on "Plaintiff[/Wife's] Petition to Enforce the Property Settlement Agreement, Amended

---

[*] Former Justice specially assigned to the Superior Court.

Property Settlement Agreement, and Agreed Order filed August 2, 2021."

. . .

The parties were married in 1991 and separated in 2006. On September 3, 2008, they entered into a Property Settlement Agreement ("2008 PSA") which was incorporated into their September 16, 2008, Decree in Divorce.

Paragraph 10-14 of the 2008 PSA contains terms governing the parties' responsibilities/entitlements regarding the marital residence, Defendant/Husband's pension, certain debts, and child support. Stated as summarily as possible, in Paragraph 10, Wife was responsible for all expenses relating to the marital residence, including the first and second mortgage payments to HSBC, and she was required to refinance those mortgages or sell the residence. Paragraph 11 determined that Wife's entitlement in Husband's SERS pension was $1,000.00 per month; subject, however to suspension if Husband continued to pay the mortgages in temporary satisfaction of his child support obligation.

After contempt litigation initiated by Husband [against Wife], the parties subsequently entered into an Amended Property Settlement Agreement on August 27, 2009 (2009 APSA).

Paragraphs 10-14 of the 2008 PSA were expressly superseded by the 2009 APSA, while the balance of the 2008 PSA remained in effect. The parties agree that the 2009 APSA is the contract in dispute in these proceedings.

For the purposes of the instant controversy, the relevant provisions of the 2009 APSA are Paragraphs 1-3, 6 and 7. Paragraphs 1-3 provide a 3-stage step down of Husband's financial obligations to Wife predicated on his paying the mortgages encumbering the marital residence "in lieu of $1,000.00 in the monthly pension payment." As noted above, per the 2008 PSA, the mortgages were Wife's obligation, and Wife was entitled to $1,000 per month from the SERS pension. The 2009 APSA altered these obligations as follows:

> 1. Kevin Pierce will continue to pay the monthly mortgage payment on the property at 114 E. Summit Avenue, West Grove, PA, in lieu of $1,000

in child support and in lieu of $1,000 in the monthly pension payment until June, 2011. Payments will be made directly to the mortgage company. APSA, Paragraph 1.

2. Effective July 1, 2011, Kevin Pierce's monthly payment responsibility will be reduced to $1,500 a month. The stated amount will be in lieu of $500 in child support and in lieu of $1,000 in the monthly pension payment. Payments will be made directly to the mortgage company. Also effective July 1, 2011, Lisa Pierce will make monthly payments to Kevin Pierce in the amount of $500 a month to cover the balance of the monthly mortgage payment until July 2013. These payments are to be received on or before the 1st day of each month. APSA, Paragraph 2.

3. Effective July 1, 2013, Kevin Pierce's monthly payment responsibility will be reduced to $1,000 a month. The stated amount will be in lieu of the $1,000 per month pension payment. Payments will be made directly to the mortgage company. Also effective July 1, 2013, Lisa Pierce will make monthly payments to Kevin Pierce in the amount of $1,000 a month to cover the balance of the monthly mortgage payment until at which time the mortgage is satisfied. These payments are to be received on or before the 1st day of every month. Once the mortgage is satisfied, Kevin Pierce will sign the property over to Lisa Pierce as sole owner. APSA, Paragraph 3.

Paragraph 6 of the 2009 APSA commits Wife "to be responsible for all taxes, homeowners' insurance and all other expenses associated with the property [the marital residence]."

Paragraph 7 of the 2009 APSA creates an option for either party to terminate the APSA "before the mortgage [sic] is satisfied," by giving 3 months written notice of intent to terminate. APSA Paragraph 7(a).

- 3 -

It further provides that once notice is given, Wife was obligated to vacate the marital residence within 3 months, and the property was to immediately be marketed for sale. Significantly, it also provided that, "During the time the property is listed for sale, Kevin Pierce [Defendant] will be responsible for the full amount of the mortgage payments until the property is sold." APSA, Paragraph 7(b).

Pursuant to Paragraph 7(c) of the 2009 APSA, Wife would not begin receiving her $1,000 pension payments until the property was sold and Husband was relieved of making mortgage payments on the property.

The parties agreed that once the property was sold, "all proceeds will be divided 50/50." APSA, Paragraph 7(d).

[In the trial court's opinion, most] crucial to the present dispute are the provisions of Paragraph 7(e) and (f), which provide:

> (e)   Once the property is sold, the total amount of the mortgage payments paid by Kevin Pierce toward the mortgage in lieu of monthly pension payments from the date of separation until the time the property is sold will be deducted from Lisa Pierce's portion of the [marital] value of the pension which was valued at $206,792.

> (f)   The total amount of the mortgage payments paid by Kevin Pierce toward the mortgage in lieu of monthly pension payments from the date of separation until the time the property is sold will be determined once the property is sold and deducted from Lisa Pierce's portion of the [marital] value of the pension. If a balanced exists at this time, a QDRO will be written to state that Lisa Pierce will receive $1,000 a month until the remaining balance of Lisa Pierce's [marital] value of the pension is met.
> APSA Paragraphs 7(e) and (f).

In July of 2011, Husband filed a Petition for Special Relief/Petition to Enforce the original PSA and APSA. Husband alleged, among other things, that Wife had failed to pay the 2009 and 2010 real estate taxes on the marital residence.

After hearing, [the trial court] entered an order on September 23, 2011 . . . deducting $12,642 from Wife's eventual share of the pension and requiring her to vacate the property and leave it in "move in condition" by December 1, 2011. That order also required Wife to pay Husband $3,000 representing payments from her to him pursuant to Paragraph 2 of the 2009 APSA. That sum was also to be deducted from the pension monies to her.

The parties agree that Husband's July 2011 filing triggered the notice of termination requirement under Paragraph 7(a) of the 2009 APSA.

Wife moved out of the residence on December 4, 2011. Husband claims it was not left in "clean, habitable condition" (his words), and he incurred $14,899.55 to render it marketable.

However, he did not market it for sale as he had agreed to do, because it was still "under water"—the balances of the 1st and 2nd mortgages exceeded its fair market value. Instead, Husband decided to lease the property out at $1,100 effective 2/1/2012 (later increased to $1,125). While the lease was effective February 1, 2012, Husband had made the decision to rent in December, before Wife had even vacated the property. All rents were received and deposited by Husband.

Husband sold the home to his tenants in June, 2021. He alleges he was solely responsible for the mortgage payments, taxes, and expenses once Wife deeded the home to him in April 2020. Wife allege[d] that Husband was responsible for those obligations after she moved out in December 2011.

[The trial court determined that] to calculate what, if anything, Wife [was] owed . . . from Husband's SERS pension, [it was necessary to review] the various operative provisions of the 2009 APSA [with reference to] the "termination" provisions of Paragraph 7. [The court set out to identify what] the start and end points [were] for calculating mortgage payments made "in lieu of pension payments" and to determine the amount of those payments. [The trial court also considered other] mandates by the APSA . . . before determining [Wife's] entitlement, if any.

Trial Court Order and Opinion, 12/3/21, at 1-5, 10.

- 5 -

In summary, the trial court found that August 27, 2009, was the start date and December 4, 2011, was the end date for capturing mortgage payments made in lieu of monthly pension payments. It then arrived at a tentative net pension amount of $90,954.85 due Wife by deducting, *inter alia*, $57,736.00 in mortgage payments made in lieu of pension payments. This timely appeal followed.

Husband presents the following questions for this Court's consideration:

1. Did the Court err to place upon Husband the unreimbursed "responsibility" in 2009 to pay the mortgage when no such duty existed?

2. Was it not error for the Court to relieve Wife from the terms of the PSA and APSA 7(e)(f) which required her to repay him for all sums he had paid after the Court found that Wife had repeatedly breached both the PSA of 2008 and the APSA of 2009 and breached from 2009 to 2020[?]

3. Did not the Court err by not perceiving that the terms of the APSA of 2009 were ambiguous where the Court's conclusion was wholly inconsistent with the PSA of 2008 that Wife would have the house and all the debt and profits while ignoring APSA 7(e) statement that "Once the property is sold, the total amount of the mortgage payments paid by Kevin Pierce toward the mortgage in lieu of monthly pension payments from the date of separation until the time the property is sold will be deducted from Lisa Pierce's portion of the marital value of the pension. . .?

4. Where Wife was wholly liable for both mortgages on the marital home per PSA and APSA and was to indemnify and hold Husband harmless from debt, was it not error for the Court to interpret the language of APSA of 2009 to switch the entire debt to Husband where the language did not say nor inform

Husband in any way that he would be "fully liable for all debt" without fair consideration to support the radical change in the contract?

Brief of Appellant at 5-7.

As the instant issue relates to the effect of the parties' property settlement agreement, our standard of review is as follows.

In Pennsylvania, we enforce property settlement agreements between husband and wife in accordance with the same rules applying to contract interpretation. A court may construe or interpret a [marital settlement agreement] as it would a contract, but it has neither the power nor the authority to modify or vary the [agreement] unless there has been fraud, accident or mistake.

It is well-established that the paramount goal of contract interpretation is to ascertain and give effect to the parties' intent. When the trier of fact has determined the intent of the parties to a contract, an appellate court will defer to that determination if it is supported by the evidence.

Further, where...the words of a contract are clear and unambiguous, the intent of the parties is to be ascertained from the express language of the agreement itself.

*Conway v. Conway*, 209 A.3d 367 (Pa. Super. 2019) (quoting *Bianchi v. Bianchi*, 859 A.2d 511, 515 (Pa. Super. 2004) (internal citations and quotation marks omitted)). *See also Crispo v. Crispo*, 909 A.2d 308 (Pa. Super. 2006) (explaining where property settlement agreement did not merge into divorce decree, it stood as a separate contract subject to law governing contracts).

"On appeal from an order interpreting a marital settlement agreement, we must decide whether the trial court committed an error of law or abused its discretion." *Kraisinger v. Kraisinger*, 928 A.2d 333, 339 (Pa. Super.

2007) (quoting **Stamerro v. Stamerro**, 889 A.2d 1251, 1257 (Pa.Super. 2005)). "Because contract interpretation is a question of law, this Court is not bound by the trial court's interpretation." **Mazurek v. Russell**, 96 A.3d 372, 378 (Pa. Super. 2014) (quoting **Stamerro**, **supra** at 1257).

> When analyzing contracts which involve clear and unambiguous terms, a court must look to the writing itself to give effect to the parties' understanding. The court must construe the contract only as written and may not rewrite the contract or give it a construction that conflicts with the plain, ordinary and accepted meaning of the words used.

**Sorace v. Sorace**, 665 A.2d 125, 127 (Pa. Super. 1995) (internal citations omitted).

Where the contract terms are ambiguous, however, the court is free to receive extrinsic evidence to resolve the ambiguity.

> A contract will be found to be ambiguous only if it is fairly susceptible of different constructions and capable of being understood in more than one sense. It is the function of the court to decide, as a matter of law, whether the contract terms are clear or ambiguous. The fact that the parties have different interpretations of a contract does not render the contract ambiguous.

**Tuthill v. Tuthill**, 763 A.2d 417, 420 (Pa. Super. 2000) (internal citations omitted).

Initially, we note Husband fails to provide a discrete argument for each of the above questions raised. Instead, his brief presents a single, overarching argument that the court erroneously interpreted the PSA and APSA to place upon him sole responsibility for mortgage payments on the marital property

from the 2011 commencement of the termination period until the 2020 sale of the property to the long-time tenants.

Husband's argument to this end is at times difficult to follow. The challenging form chosen by him is to present piecemeal excerpts from the trial court's Order and Opinion of December 3, 2021, followed by brief responses in which Husband asserts court error in some respect.

Read as a whole, however, a coherent argument emerges that under the terms of Paragraphs 7(e) and (f) of the 2009 APSA, Wife's eventual share of Husband's pension should have been reduced by the dollar amount of the mortgage payments Husband paid from 2011 to 2020. Therefore, notwithstanding the brief's divergence from the directive in Rule of Appellate Procedure 2119 that an argument "shall be divided into as many parts as there are questions to be argued"[1], we decline to find waiver and choose to address Husband's argument on the merits.

The present controversy centers on how the interplay between Subsections 7(b) and, collectively, 7(e) and (f) of the 2009 APSA affected the parties' respective obligations regarding monthly pension payments made

---

[1] The full text of Rule 2119(a) provides:

> (a) **General rule.** The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part—in distinctive type or in type distinctively displayed—the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent.

during the termination period. As noted, *supra*, subsections 7(e) and (f) provide as follows:

> (e)    Once the property is sold, the total amount of the mortgage payments paid by Kevin Pierce toward the mortgage in lieu of monthly pension payments from the date of separation until the time the property is sold will be deducted from Lisa Pierce's portion of the marital value of the pension which was valued at $206,792.85.
>
> (f)    The total amount of the mortgage payments paid by Kevin Pierce toward the mortgage in lieu of monthly pension payments from the date of separation until the time the property is sold will be determined once the property is sold and deducted from Lisa Pierce's portion of the marital value of the pension. If a balance exists at this time, a QDRO will be written to state that Lisa Pierce will receive $1,000 a month until the remaining balance of Lisa Pierce's marital value of the pension is met.

APSA Paragraph 7(e) and (f).

Subsection 7(b), meanwhile, provides that upon the decision to terminate the APSA,

> "Lisa Pierce will be required to vacate the property within 3 months and the property will be immediately placed on the market until sold. During the time the property is listed for sale, Kevin Pierce will be responsible for the full amount of the mortgage payments until the property is sold.

APSA Paragraph 7(b) (emphasis added).

Husband contends that nothing in subsections 7(e) and (f) makes crediting his mortgage payments against Wife's share of his pension conditional upon Wife's retaining residency in the marital home. Indeed, he claims Wife obtained a windfall by the trial court's refusal to decrease her share of the pension by the cumulative total of monthly mortgage payments

he made on the marital house from 2009 through 2020.[2]  He insists he would not have made the payments if he had known they would not be applied to reduce Wife's pension share.

The trial court, on the other hand, read the provisions at issue in light of both the stated purpose of the APSA, which was to enable Wife to retain stable housing, and the specific language of Section 7(b) making Husband solely responsible for "the full amount" of the mortgage payments if the APSA were terminated, which had the dual effect of requiring Wife to vacate the home and triggering the immediate duty to place the marital home for sale.

Most critical to the present inquiry, the trial court reasoned, was how the APSA established Husband's mortgage payment obligations differently depending on whether or not Wife lived in the marital residence.  Specifically, the APSA qualified Husband's mortgage payments as being "in *lieu* of monthly pension payments" to Wife only in those provisions that applied when Wife lived in the marital residence.  **See** APSA, Sections 1-3.  The implication in such a construct was that Wife was receiving the valuable benefit of reliable housing and would, therefore, incur a deduction from her eventual share of Husband's pension equal to Husband's contribution to the mortgage payments.

In contrast, chief among the APSA provisions setting forth the changing rights and responsibilities applicable after the termination of the APSA, Wife's

_____

[2] There was agreement below that the tenants paid approximately $1,100 to $1,200 per month in rent during the eleven-year termination period.

consequential eviction, and the duty to place the home for immediate sale was subsection 7(b). Most notable in subsection 7(b), the trial court opined, was the elimination of language that mortgage payments would be made "in *lieu* of pension payments." Instead, such language was replaced with a new requirement that "Husband is responsible for the *full amount*" of the monthly mortgage payments until the property was sold. Section 7(b) (emphasis added).

This feature of termination-period mortgage payments constituted a key distinction from the parties' shared responsibilities outlined in APSA subsections 1, 2, and 3, the trial court observed, and it, thus, supported the conclusion that Husband's mortgage payments occurring after he triggered the termination phase were not made in *lieu* of pension payments.

After careful review of this record in light of governing authority cited above, we adopt the cogent rationale and well-considered decision of the trial court as expressed in its order and opinion of December 3, 2021. To this end, we concur with the trial court's determination that section 7(b) provided clear and predominant guidance to the parties that triggering the termination provisions of the APSA would preclude further deductions of Husband's mortgage payments from Wife's share of the SERS pension.

When read together with the mandate within section 7(b) that Husband bears sole responsibility for the full mortgage payment after termination of the APSA, the requirement in sections 7(e) and (f) that the court calculate the amount of "mortgage payments made in *lieu* of pension payments" between

the dates of the parties' separation and the sale of the home, respectively, must be understood as limiting such qualifying payments to those made prior to the termination of the APSA. Consistent with such a limit is the accompanying provision that the property be immediately listed for sale upon commencement of the termination period.

As such, we agree with the trial court that the 2009 APSA, as a whole, unambiguously established that the end point for calculating mortgage payments made "in lieu of pension payments" was December 4, 2011, when Husband triggered the mandatory termination of the APSA and eviction of Wife from the marital property. Accordingly, we affirm the order entered below.

Order affirmed.

Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/26/2022

Received 1/26/2022 4:27:47 PM Circulated 06/06/2022 03:12 PM

Filed 1/26/2022 4:27:06 PM Superior Court Eastern District
106 EDA 2022

LISA C. PIERCE,

         **Plaintiff,**

    vs.

KEVIN PIERCE,

         **Defendant,**

**IN THE COURT OF COMMON PLEAS OF
CHESTER COUNTY, PENNSYLVANIA**

**CIVIL DIVISION--FAMILY**

**No. 2006-08798-DI**

## ORDER

AND NOW, this **3rd** day of **December**, 2021, upon consideration of Plaintiff's Petition to Enforce the Property Settlement Agreement, Amended Property Settlement Agreement and Agreed Order, and Defendant's Reply thereto, and after hearing, it is ORDERED that:

1. Pursuant to the terms of the parties' September 3, 2008 Property Settlement Agreement, August 27, 2009 Amended and this Court's September 23, 2011 Order, Plaintiff is entitled to the tentative sum of $90,954.85 from Defendant's SERS pension account, to be paid at the rate of $1000 per month. The precise sum shall be calculated by agreement of the parties or by further Order of Court after conference with counsel.

2. Plaintiff shall engage KLM Attorneys or other reputable professionals to prepare a Qualified Domestic Relations Order (QDRO). The cost of preparation shall be borne by Plaintiff.

3. Within five (5) days of being presented with same, Defendant shall execute all documents necessary to secure to Plaintiff receipt of her entitlement to said pension sums via QDRO.

4. Plaintiff's demand for counsel fees is DENIED.

BY THE COURT:

_____ J.

SENT

DEC 08 2021

LISA C. PIERCE,
   Plaintiff,

vs.

KEVIN PIERCE,
   Defendant,

IN THE COURT OF COMMON PLEAS OF

CHESTER COUNTY, PENNSYLVANIA

CIVIL DIVISION--FAMILY

No. 2006-08798-DI

## DECISION

This matter comes before me on Plaintiff's Petition to Enforce the Property Settlement Agreement, Amended Property Settlement Agreement and Agreed Order filed August 2, 2021.

At issue is the amount of Defendant's pension payable to Plaintiff pursuant to the parties' 2008 and 2009 Property Settlement Agreements. After hearing and briefs by counsel for the parties, I have determined that Plaintiff's remaining entitlement to Defendant's pension is tentatively $90,954.85.

**Background**

The parties were married in 1991 and separated in 2006. On September 3, 2008, they entered into a Property Settlement Agreement (the 2008 PSA) which was incorporated into their September 16, 2008 Decree in Divorce.

Paragraphs 10-14 of the 2008 PSA contains terms governing the parties' responsibilities/entitlement regarding the marital residence, Defendant's pension, certain debts and child support. Stated as summarily as possible, in Paragraph 10 Plaintiff was responsible for all expenses relating to the marital residence, including the first and second mortgage payments to HSBC, and she was required to refinance those mortgages or sell the residence. Paragraph 11 determined that Plaintiff's

SENT

DEC 08 2021

1

entitlement in Defendant's SERS pension was $1000.00 per month; subject, however to suspension if Defendant continued to pay the mortgages in temporary satisfaction of his child support obligation. Paragraph 14 established Defendant's child support obligation.

After contempt litigation initiated by Defendant, the parties subsequently entered into an Amended Property Settlement Agreement on August 27, 2009 (2009 APSA).

Paragraphs 10-14 of the 2008 PSA were expressly superseded by the 2009 APSA, while the balance of the 2008 PSA remained in effect. The parties agree that the 2009 APSA is the contract in dispute in these proceedings.

For the purposes of the instant controversy, the relevant provisions of the 2009 APSA are Paragraphs 1-3, 6 and 7. Paragraphs 1-3 provide a 3-stage step down of Defendant's financial obligations to Plaintiff predicated on his paying the mortgages encumbering the marital residence "in lieu of $1,000.00 in the monthly pension payment". As noted above, per the 2008 PSA, the mortgages were Plaintiff's obligation, and Plaintiff was entitled to $1000 per month from the SERS pension. The 2009 APSA altered these obligations as follows:

1. Kevin Pierce will continue to pay the monthly mortgage payment on the property at 114 E. Summit Avenue, West Grove, PA, in lieu of $1,000 in child support and in lieu of $1,000 in the monthly pension payment until June, 2011. Payments will be made directly to the mortgage company. APSA, Paragraph 1.

2. Effective July 1, 2011 Kevin Pierce's monthly payment responsibility will be reduced to $1,500 a month. The stated amount will be in lieu of $500 in child support and in lieu of $1,000 in the monthly pension payment. Payments will be made directly to the mortgage company. Also effective July 1, 2011 Lisa Pierce will make monthly payments to Kevin Pierce in the amount of $500 a month to cover the balance of the monthly mortgage payment until July 2013. These payments are to be received on or before the 1st day of each month. APSA, Paragraph 2.

2

3.     Effective July 1, 2013, Kevin Pierce's monthly payment responsibility will be reduced to $1,000 a month. The stated amount will be in lieu of the $1,000 per month pension payment. Payments will be made directly to the mortgage company. Also effective July 1, 2013, Lisa Pierce will make monthly payments to Kevin Pierce in the amount of $1,000 a month to cover the balance of the monthly mortgage payment until at which time the mortgage is satisfied. These payments are to be received on or before the 1st day of every month. Once the mortgage is satisfied, Kevin Pierce will sign the property over to Lisa Pierce as sole owner.

APSA, Paragraph 3.

Paragraph 6 of the 2009 APSA commits Plaintiff "to be responsible for all taxes, homeowners' insurance and all other expenses associated with the property [the marital residence]."

Paragraph 7 of the 2009 APSA creates an option for either party to terminate the APSA "before the mortgage [sic] is satisfied," by giving 3 months written notice of intent to terminate. APSA Paragraph 7(a).

It further provides that once notice is given, Plaintiff was obligated to vacate the marital residence within 3 months, and the property was to immediately be marketed for sale. Significantly, it also provided that "During the time the property is listed for sale, Kevin Pierce [Defendant] will be responsible for the full amount of the mortgage payments until the property is sold." APSA, Paragraph 7(b).

Pursuant to Paragraph 7(c) of the 2009 APSA, Plaintiff would not begin receiving her $1,000 pension payments until the property was sold and Defendant was relieved of making mortgage payments on the property.

The parties agreed that once the property was sold, "all proceeds will be divided 50/50." APSA, Paragraph 7(d).

Most crucial to the present dispute are the provisions of Paragraph 7 (e) and (f), which provide:

3

(e) Once the property is sold, the total amount of the mortgage payments paid by Kevin Pierce toward the mortgage in lieu of monthly pension payments from the date of separation until the time the property is sold will be deducted from Lisa Pierce's portion of the martial [sic] value of the pension which was valued at $206,792.85.

(f) The total amount of the mortgage payments paid by Kevin Pierce toward the mortgage in lieu of monthly pension payments from the date of separation until the time the property is sold will be determined once the property is sold and deducted from Lisa Pierce's portion of the martial [sic] value of the pension. If a balance exists at this time, a QDRO will be written to state that Lisa Pierce will receive $1,000 a month until the remaining balance of Lisa Pierce's martial [sic] value of the pension is met.

APSA Paragraphs 7(e) and (f).

In July of 2011, Defendant filed a Petition for Special Relief/Petition to Enforce the original PSA and APSA. Defendant alleged, among other things, that Plaintiff had failed to pay the 2009 and 2010 real estate taxes on the marital residence. After hearing, I entered an order on September 23, 2011 [docketed 10/17/2011] deducting $12,642 from Plaintiff's eventual share of the pension and requiring her to vacate the property and leave it in "move in condition" by December 1, 2011. That order also required Plaintiff to pay Defendant $3,000 representing payments from her to him pursuant to Paragraph 2 of the 2009 APSA. That sum was also to be deducted from the pension monies owed to her.

The parties agree that Defendant's July 2011 filing triggered the notice of termination requirement under Paragraph 7(a) of the 2009 APSA.

Plaintiff moved out of the residence on December 4, 2011. Defendant claims it was not left in "clean, habitable condition," (his words) and he incurred $14,899.55 to render it marketable.

4

However, he did not market it for sale as he had agreed to do, because it was still "under water"-- the balances of the 1st and 2nd mortgages exceeded its fair market value. Instead, Defendant decided to lease the property out at $1,100 effective 2/1/2012 (later increased to $1,125). While the lease was effective February 1, 2012, Defendant had made the decision to rent in December, before Plaintiff had even vacated the property. All rents were received and deposited by Defendant.

The parties agree that the total amount of rent received by him from February 1,2012 (including the security deposit paid in December 2011), was $111,300.00.

Plaintiff conveyed her interest in the property to Defendant via quit claim deed in April 2020, after agreeing to do so in a Stipulation and Order filed January 23, 2020. This was a result of a 3rd Petition for Enforcement brought by Defendant.

Defendant sold the home to his tenants in June, 2021. He alleges he was solely responsible for the mortgage payments, taxes and expenses once Plaintiff deeded the home to him in April 2020. Plaintiff alleges that he was responsible for those obligations after she moved out in December 2011.

In order to calculate what, if anything, Plaintiff is owed now from Defendant's SERS pension, I must circle back to the various operative provisions of the 2009 APSA, viewed through the lens of the "termination" provisions of Paragraph 7. I must determine what the start and end points are for calculating mortgage payments made "in lieu of pension payments", and determine the amount of those payments. Other offsets mandated by the APSA must also be taken into account before determining Plaintiff's entitlement, if any.

5

## Mortgage Payments In Lieu of Pension

For the reasons explained more fully below, I find that August 27, 2009 was the start date and December 4, 2011 was the end date for capturing "mortgage payments made in lieu of monthly pension payments".

Paragraphs 1-3 of the 2009 APSA provide for the 3 stages of credit Defendant is to receive by payment of the mortgages in lieu of his $1,000 per month pension payment which was established in the original 2008 Property Settlement Agreement. Paragraph 7(e) states "the total amount of the mortgage payments paid by Kevin Pierce toward the mortgage **in lieu of monthly pension payments** from the date of separation until the property is sold."... (emphasis mine). The obligation to make the monthly mortgage payments **in lieu of pension payments** did not exist until the 2009 APSA.

Prior to the 2009 ASPA, under Paragraph 11 (c) (i) of the 2008 PSA, **"Husband's child and spousal support obligation** to Wife" [emphasis mine] were then being met by Husband making the first and second mortgage payments. It further allows him to do so "in temporary satisfaction of his child and spousal support obligations, if any" until Wife refinances the mortgages or sells the residence, allowing him to "retain the entirety of the monthly SERS pension benefit as long as he does so." The 2008 PSA makes no provision for payment of mortgages **in lieu of pension**, only in lieu of support. While they were operating under the 2008 PSA, Plaintiff did not refinance the mortgages or sell the property. Defendant did pay the mortgages, receiving credit against his child and spousal support obligations, and did receive the full amount of the monthly SERS pension.

6

Once the parties executed the August 27, 2009 APSA, the construct of mortgage payments **in lieu of pension payments** is set forth in Paragraphs 1-4, and Paragraph 7. While the earlier Paragraphs delineate a 3 step reduction in Defendant's financial obligations to Plaintiff, his paying the mortgages is always termed **in lieu of the $1000 monthly pension benefit** due to Plaintiff, even when Plaintiff also owes him a contribution to the mortgages.

As noted above, Defendant's July 2011 filing triggered the termination terms of Paragraph 7 of the 2009 APSA. Plaintiff moved out December 4, 2011. Per Paragraph 7 (b), the marital residence was to be listed for sale "immediately", and per that Paragraphs, Defendant became responsible for the "full amount of the mortgage payments until the property is sold." This obligation unconditional; is not qualified as "in lieu of monthly pension payments".

Although the parties were supposed to sell the property, it continued to have negative equity. Defendant claims he repeated attempted to have Plaintiff list the property, but Plaintiff refused. Plaintiff says she only refused one time, because she knew the property was under water at that time. Regardless, Defendant did rent out the property and received $111,300 in rent. As of December 4, 2011, Defendant became responsible for the mortgage payments, without offset, until the property was sold. Because it was his sole obligation, any rents received are likewise his sole entitlement. The evidence is clear that the monthly rent received was less than the monthly mortgage payments, so this did not create a windfall to Defendant; he was out of pocket every month.

7

Defendant interprets Paragraph 7(e) to require that he get a dollar for dollar credit for mortgage payments made from 2006, when they separated, until the date Plaintiff conveyed the property to him in 2020.

Plaintiff relies on Paragraph 7(b) and argues that from the time she moved out (December 2011) Defendant was "responsible for the full amount of the mortgage payments until the property is sold." I find that language to be unequivocal. Post termination, there is no reference to further credits for mortgage payments being "in lieu of" pension payments. Thus the end date of credits for mortgage payments "in lieu of" pension is December 4, 2011. September ,2009 (the first month post -execution of the 2009 APSA) through December 4, 2011 is 28 months of mortgage payments "in lieu of monthly pension payments". The exact dollar amount of those payments is theoretically discernable from Exhibit R-2 admitted at hearing, however, I am unable to interpret it accurately. I am relying on the very competent counsel in this case to calculate and agree to the figure based on that exhibit; otherwise to conference with this judge to arrive at a number.[1]

**Additional Deductions**

The analysis does not end there. The deduction against the pension for mortgage payments is not the only deduction to be offset against the pension per Paragraph 7 of the 2009 APSA. According to Paragraph 2 of the APSA, as of 7/1/2011 Plaintiff owed Defendant $500 per month "to cover the balance of the monthly mortgage payment", which obligation ended when the agreement was terminated per

---

[1] In the 2008 PSA, the payments were stated as $1570.13 on the 1st and $491.99 on the 2nd mortgage, or $2062.12 per month. However, it appears that over time the monthly amounts were not consistent, and the breakdown on R-2 is confounding. For purposes of **estimating** the amount of credit due, I have used 28 months at $2062.

8

Paragraph 7. The sum due was quantified at $3000.00 by my September 23, 2011 order which provided that it would be deducted from Plaintiff's pension entitlement.

Paragraph 7 of the 2009 APSA does not expressly deal with the post-termination obligation for real estate taxes, homeowner's insurance or other expenses associated with the upkeep of the marital. Prior to the triggering of the termination provisions, Paragraph 6 placed the obligation for taxes and upkeep on Plaintiff. Paragraph 7 is silent on the issue.

Once termination was invoked in Paragraph 7, it would seem the obligation continued into Paragraph 6 was likewise terminated. Because there is no reference in Paragraph 7 as to who has responsibility for those expenses post-termination, the only logical conclusion is that they both do. Just as they continued to co-own the property, they should continue to be jointly responsible for taxes and expenses from December 4, 2011 until Plaintiff deeded the property to Defendant in April 2020.

In his closing memorandum, Defendant's counsel has calculated 50% of the real estate taxes paid at $22,087, which assumes he paid the full amount of $44,174. Exhibit R-3. Plaintiff's obligation to pay one-half runs from January 2010 to April 2020. Since defendant paid 100% of the taxes for that period, Plaintiff's one-half share is to be deducted from any pension entitlement remaining.

Similarly, per Exhibit R-4, Defendant paid all homeowner's insurance premiums of $4,519 between June 2013 and June 2020; 50% of that sum is $2,259, which is to be deducted from any pension entitlement. Using the same time frame, Defendant incurred and paid $6,428 in services and repairs to the property, Plaintiff's 50% share, $324, is to be deducted from her pension entitlement. I decline to deduct the $523

9

inspection fees incurred, as they are solely as a result of Defendant's decision to rent out the property.

In addition, per this Court's Order of September 23, 2011, Plaintiff owes Defendant $12,642 for 2009 and 2010 real estate taxes which is to be debited from her pension entitlement. Pursuant to that same Order, Plaintiff was to leave the property in move-in condition upon vacating it. While Plaintiff did make substantial efforts to clean it out, Defendant testified credibly that he incurred $14,900 in clean out, repairs, etc. Plaintiff owes 100% of that sum and it will be debited against her pension entitlement.

## Summary

In summary, the tentative net pension amount due to Plaintiff is as follows:

| | |
|---|---|
| Stipulated value of Lisa Pierce's marital interest SERS pension | $206,792.85 |
| Less 28 months payments in lieu of pension estimate (tentative) | ($57,736.00) |
| Less one-half of property taxes | ($22,087.00) |
| Less one-half homeowners insurance premiums | ($2,259.00) |
| Less services and repairs to the property | ($3,214.00) |
| Less clean out costs | ($14,900.00) |
| Less taxes owed per 9/23/2011 Order | ($12,642.00) |
| Less due per Paragraph 2 of APSA and Paragraph 5 of 9/23/2011 Order | ($3,000.00) |
| **Balance of pension due (tentative)** | **$90,954.85** |

Accordingly the following Order is entered:

10